UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ANAHUAC MANAGEMENT, a Nevada Corporation, | Case No. 2:09-cv-01590-MMD-PAL |
| Plaintiff, | BENCH ORDER |
| v. | |
| KEITH A. MAZER, et al., | |
| Defendants. | |

KEITH A. MAZER,

          Counterclaim Plaintiff,

     v.

ANAHUAC MANAGEMENT, a Nevada Corporation,

          Counterclaim Defendant.

KEITH A. MAZER,

          Third-Party Plaintiff,

     v.

JEHU HAND,

          Third-Party Defendant.

## I.  SUMMARY

This case involves a seemingly straightforward breach of contract dispute.  Two business partners entered into a transaction, but relations soured and one or the other breached the contract.  However, trial testimonies reveal a plethora of what appears to be unrelated dubious transactions conducted by the parties and feckless non-parties.

Most of this information was wholly irrelevant to the contract dispute at hand although the Court was unable to determine whether this was due to the parties' attempt to artfully avoid fully disclosing the true nature of these transactions.  What was pertinent to the contract dispute presented to the Court is the issue of performance.  Yet, it remains unclear to the Court who paid for Anahuac Management's stock in CleanTech, and to whom CleanTech delivered its stock.  Because these issues remained unclear and unproven at the conclusion of the proceedings, the Court cannot find in favor of either party.

## II.    THE CLAIMS

The pleadings present this case as a contract and securities dispute involving Keith Mazer and World Capital Funding, LLC ("WCF") (collectively "Defendants") against Anahuac Management and its corporate counsel, Jehu Hand.  Anahuac initially brought suit, alleging that in 2007, Mazer, acting on behalf of WCF, contacted Anahuac's president Yuriy Semenov to discuss purchasing a convertible debenture[1] issued by a company that would later merge with CleanTech Biofuels, Inc. ("CleanTech").  Semenov allegedly agreed to Defendants' proposal and subsequently purchased the debenture. In March, the debenture was converted into common stock, and Anahuac requested the stock from Defendants.  However, according to Anahuac, Defendants never intended to give possession of the stock to Anahuac and now seek "stock power," allowing Defendants to transfer the shares to Mazer without ever giving them to Anahuac or compensating Anahuac.

In their counterclaims, Defendants allege that Mazer and Hand had previously participated in at least two joint ventures and other matters and that Hand currently owes Mazer a substantial amount of money.  Allegedly, because Hand could not pay this debt, Hand retained Mazer to consult on the purchase of the CleanTech stock and Mazer, not

---

[1]The parties agree that "debenture" in this case refers to a loan instrument, which may be converted into equity, or shares, of the issuing Company's stock.  (Dkt. no. 67 at 3.)

1   Anahuac, actually paid for the stock.  Through this investment, Mazer would be able to

2   recuperate at least some of the money Hand owed to him from their prior dealings.

3   Hand and Anahuac, however, never compensated Mazer for the amounts invested.

4        On December 29, 2008, Anahuac filed suit in Nevada state court against

5   Defendants.  Defendants subsequently removed the case to this Court on the basis of

6   federal subject matter jurisdiction.  On November 11, 2009, Anahuac filed an Amended

7   Complaint (dkt. no. 11), alleging claims for: (1) fraud in violation of 15 U.S.C. § 78(j)

8   ("SEC Rule 10b-5" or "Rule 10b-5d"); (2) violation of the Nevada Uniform Securities Act,

9   NRS §§ 90.310, 90.570, and 90.610; (3) fraud; (4) negligent misrepresentation; (5)

10  breach of fiduciary duty; (6) conversion; and (7) breach of contract.   Before trial,

11  Anahuac abandoned its breach of contract claim.

12       On September 16, 2010, Defendants filed their Answer (dkt. no. 25), which

13  included Mazer's counterclaims against Anahuac and Third-Party Complaint against

14  Jehu Hand.  Mazer alleged claims for: (1) breach of contract; (2) setoff; and (3) unjust

15  enrichment.  Mazer's set-off claim was previously dismissed by this Court.  (Dkt. no. 38.)

16       The parties participated in a bench trial from November 27 to November 29, 2012.

17  The Court heard testimony from three witnesses: Plaintiff Yuriy Semenov for Anahuac

18  Management, Defendant and Counterclaimant Keith Mazer for himself and WCF, and

19  Third-Party Defendant Jehu Hand.   The same three witnesses testified both in Plaintiff's

20  case in chief and Defendants' defense and counter-case in chief.

21  **III.   PRELIMINARY ISSUE**

22       At trial, Plaintiff moved to amend the Complaint to modify the conversion cause of

23  action.  In the Complaint and through all the pre-trial filings in the case, Plaintiff alleged

24  that Mazer acquired physical possession of CleanTech shares and wrongfully retained

25  physical possession of such shares.  At trial, Plaintiff sought to amend the Complaint to

26  allege that even if Mazer did not retain physical possession over the CleanTech shares,

27  Mazer asserted title over the shares.  The Court denied Plaintiff's Motion and held that

28  any evidence introduced on this point would not be considered by the Court.  The Court

1   based its ruling on the fact that Plaintiff had notice of the facts giving rise to this claim

2   long before trial.  Also key to the Court's decision was that in response to Request No.

3   34, when Plaintiff asked Defendants to admit that in January of 2009 Defendants caused

4   the law firm of Baker & Hostetler to ask CleanTech to stop order on all CleanTech

5   shares issued to Anahuac, Defendants objected and asserted that whether Mazer or

6   WCF did so was irrelevant to any asserted claims.  The Court found that this should

7   have given Plaintiff notice that the conversion claim asserted in the Complaint did not

8   cover the theory that Mazer asserted dominion, but not physical control, over the

9   CleanTech stock.   Moreover, the Court determined that Plaintiff had ample opportunity

10  to amend the Complaint to include the proposed amended claim before trial but chose

11  not to.  The Court determined that because of this, to allow Plaintiff to amend the

12  Complaint at trial would unduly prejudice Defendants.  (Dkt. no. 103 at 371-73.)

13  **IV.   FINDINGS OF FACT**

14          At the outset, the Court makes two observations.  First, the parties presented a

15  great deal of evidence regarding other deals between Mazer and Hand and other entities

16  aside from Anahuac who invested in CleanTech.  Because most of this evidence is not

17  relevant to the allegations in this case, the Court does not address such evidence in its

18  findings of fact or conclusions of law.

19          Second, both of the parties' claims involve several factual prerequisites that the

20  Court determines cannot be found by a preponderance of the evidence.  Accordingly,

21  below the Court addresses both (1) the allegations or assertions that were essential to

22  each parties' cases and which were affirmatively proven by a preponderance of

23  evidence; and (2) the allegations or assertions that were essential to each parties' cases

24  but not proven at trial.

25          1.   Anahuac Management is an investment company and Nevada corporation

26              authorized to do business in the State of Nevada.

27  ///

28  ///

4

1  2.  Anahuac's sole officer and employee is Yuriy Semenov, although Semenov

2     lacked important knowledge about Anahuac's investments and operations,

3     *see infra*.

4  3.  Jehu Hand is a California securities attorney.  Hand is a securities attorney

5     and the owner of Hand & Hand Law Firm.

6  4.  Hand was Anahuac's legal counsel during the relevant time period.

7  5.  Kimberly Peterson was Jehu Hand's assistant during the relevant time

8     period.

9  6.  Keith Mazer is CEO of WCF, a consulting company.

10  7.  Keith Mazer was not licensed as a securities broker in Nevada during the

11     relevant time period.

12  8.  Mazer worked fee basis rather than a commission basis during the relevant

13     time period.

14  9.  Roseanne Baack was an independent contractor for WCF during the

15     relevant time period.

16  10.  In the course of his business, Mazer worked for SRS Management a/k/a

17     CleanTech.  Mazer advised SRS about the process of taking its company

18     public, and introduced potential investors to the company.   Mazer was

19     compensated on a fee basis that was not dependent on the outcome of the

20     investment or the number of investors.

21  11.  Hand and Mazer had worked together in several business transactions

22     before the CleanTech deal.

23  12.  Mazer informed Hand several times that Hand owed Mazer money from

24     their prior business dealings.  Hand did not dispute Mazer's claim that he

25     owed Mazer money until the parties had a falling out.

26  13.  Anahuac was a shell corporation, used by Hand to conduct business on

27     behalf of himself and his other companies.

28 ///

- Yuriy Semenov acted merely as a figurehead. The Court did not find credible Semenov's testimony that he was the President and owner of the Company.

- Semenov lacked the content and knowledge typically associated with a President and sole shareholder of a company. For example:

  o he did not understand the nature of the debenture agreement (dkt. no. 102 at 20, 56);

  o he lacked knowledge about where the funds to pay for the debenture came from (dkt. no. 102 at 156);

  o Semenov did not understand the meaning of "keeping a corporation's books," and testified that he balanced Anahuac's books "in [his] mind, and [his] diary, and wherever [he] find it's [sic] useful." (dkt. no. 102 at 170);

  o Semenov testified that before the initiation of this litigation, he did not know about Anahuac's purported belief that the funds used to pay for the CleanTech stock came from Duluth Venture Capital, and that he did not care where the wire of the funds to pay for the CleanTech stock came from. (Dkt. no. 104 at 108.)

- Hand exerted significant power over Anahuac:

  o Hand had password and log-in information to Anahuac's stocks, and gave this information to Mazer. (*See* ex. 535 at KM 0044);

  o Semenov testified that he forwarded all documents regarding the debenture and promissory note to Hand.

14.   Hand and Mazer entered into a verbal agreement under which Mazer purchased a 4.9% interest in CleanTech stock in Anahuac's name. When the stocks were sold Mazer would receive 95% of the proceeds. Hand would receive 5% of the proceeds of the sale of the stock in exchange for

///

///

///

///

6

allowing Mazer to purchase his interest in CleanTech under Anahuac's name.[2]

The parties disputed this fact at trial.  Hand testified that this contract did not exist.  Mazer testified that it did.  The Court found Mazer's testimony more credible.  Specifically, the Court finds by a preponderance of the evidence that the contract existed because:

- Hand admitted at trial that he and Mazer entered into a similar agreement with another company, Duluth.

- Hand testified that in that deal, Duluth had put up the money to buy CleanTech stock.  Duluth got 1.5 million shares.  Duluth agreed to let Mazer trade the stock and to give Mazer half the profits from the sale.  Duluth is Hand's client and, at least on paper, was owned by a third party, William Wilkinson.

- The defense presented evidence that Mazer had a limited power of attorney for Duluth, under which he was authorized to buy and sell securities in Duluth's account.

- Hand testified that he traded Duluth's shares in Clean Tech stock.

- Baack asked Hand to have Anahuac sign the debenture purchase agreement and promissory note on August 9, 2007.  (Exhs. 2, 3.)

- Hand gave Mazer the log-in and password information for the Anahuac brokerage account.  (Ex. 535 at KM0044.)

///

─────────────────────

[2]The Court notes that at first, the details regarding Mazer's compensation made little sense and did not seem credible.  It was baffling why Mazer would (1) team with Hand to (2) put up Mazer's own money and buy shares in CleanTech (3) in an effort to decrease *Hand's* debt to Mazer.  Mazer clarified matters.  He stated that the reason for this arrangement was that it allowed Mazer to get around SEC regulations.  Hand had informed Mazer about this method of avoiding the regulations, and Hand testified Mazer did not understand details of securities transactions. In Mazer's opinion, this deal benefited him because Mazer received the benefit of using Anahuac's name to acquire CleanTech stock.  Mazer believed he could only purchase up to a 4.9% interest in CleanTech in his own name, so purchasing an additional 4.9% in Anahuac's name allowed Mazer the opportunity to own more shares in CleanTech than he would otherwise be allowed to own.  (*See* dkt. no. 104 at 29.)  The deal also benefited Hand, because Hand would receive a small sum of the proceeds from the sale of CleanTech stock.

15. On April 5, 2007, Gillette International wired $250,000 into Hand & Hand's Bank of America Attorney/Client Trust Account.

16. The Court cannot determine by a preponderance of the evidence that the $250,000 belonged to Mazer.

- There is no documentary evidence demonstrating that the money wired from Gillette actually belonged to Mazer. There was no evidence aside from Mazer's own testimony that the money wired from Gillette was his money.

- The Court does not find credible Mazer's testimony that the money wired by Gillette to Hand & Hand's Client Trust Account belonged to Mazer. Mazer stated that this money was his, sent to Hand & Hand to pay for the Clean Tech debenture. But Mazer appeared unsure about his answer, called Gillette his "client," (dkt. no. 103 at 96), admitted that he does not know the directors of the company, was not a signor on Gillette's account, and did not have any ownership interest in Gillette. Mazer testified:

  Q: So again, we're getting back – the $250,000 we saw from Gillette, that was your [Mazer's] money, went to Hand to buy [the shares]?

  A: I didn't say that. If that's – if that's – actually, no, that's true. I'm sorry. It was my money.

  Q: Okay.

  A: Wasn't – it wasn't my money, my money, it was money that was going through Gillette.

(Dkt. no. 103 at 21-22.)

  Q: Mr. Mazer . . . [y]ou indicated that the money that went in from Gillette into the Hand & Hand Trust account, that was money that the Directors of Gillette authorized you to send?

  A: That's correct.

  Q: Isn't it true that you don't know who the directors of Gillette are?

  A: That's – that – um, that is – that is correct.

  Q: So you don't know who they are, but they authorized you to send that money?

A: Yes, they did.

Q: And so how did they authorize you to do that?

A: Through my attorney in the Turks and Caicos.

Q: So they sent you something.  Was it in writing, or how was that – how did that actually take place?

A: By a phone call.

(Dkt. no. 103 at 6.)

17.   On April 10, 2007, a debenture was issued from CleanTech to Anahuac showing a $200,000 investment.  (Exhs. 2, 3.)

18.   On April 17, 2007, Anahuac Management entered promissory note with Clean Tech / SRS Energy in the amount of $200,000 plus interest, to purchase the CleanTech convertible debenture.

19.   CleanTech filed a registration statement with the Securities and Exchange Commission ("SEC") on December 19, 2007 which referenced Anahuac's investment of $200,000 and its ownership of up to 1,573,333 CleanTech shares.  (Ex. 6, AM0171.)

20.   In March 2008, Anahuac's obligation under the promissory note came due. (Dkt. no. 102 at 38.)

21.   On March 13, 2008, Mazer requested that Hand and Peterson send the funds Hand & Hand was holding in escrow in the amount of $474,900.00 to SRS Energy.  (Ex. 16.)

22.   On March 14, 2008, Peterson wired $474,900 from Duluth's account in a Wells Fargo account to SRS Energy. (Ex. 17.)  For reasons described above, the Court cannot find by a preponderance of the evidence that this money belonged to Mazer or WCF.

///

///

23.   On April 9, 2008, Baack sent Hand an email stating that CleanTech had not received the conversion notice from Anahuac, and asked Hand to send the notice in.  (Ex. 10.)

24.   On April 10, 2008 Peterson asked Semenov to sign and return the conversion notice "ASAP."  (Ex. 11.)

25.   On or around April 10, 2008, Semenov signed the conversion notice.   (Ex. 11.)

26.   The Court cannot determine by a preponderance of the evidence that Anahuac paid for the CleanTech debenture.

- Semenov admitted that the money for the CleanTech stock purchase did not come from Anahuac's account.

- Semenov testified that he did not really care where the funds came from to pay for the Clean Tech account.  (Dkt. no. 102 at 146):

  > Q: But you said that you didn't care where the source of those funds [the funds used to pay for the promissory note] came from.  Is that – you mean – you didn't mind if the – somebody took somebody else's money and your money was never used for that payment?
  >
  > A:  As long as I balanced the books, it's fine.  You know?  . . .

- Semenov also testified that he asked Hand to pay for the promissory note, but did not specify which account Hand should use in order to do so.  Semenov stated that he did not care whether Hand "should sell his house or sell his car" to pay for the promissory note.  (Dkt. no. 102 at 156.)

- Plaintiff argued that the funds came from Semenov's sale of DANAPC to the entity Fangos Consulting in February 2008.  Semenov sold his interest in DANAPC for $500,000, which was sent to Hand & Hand's client trust account in February 2008.  The parties agree that these funds were never sent to CleanTech to pay for the debenture.  Rather, Hand testified that Peterson mistakenly sent the wire from *Duluth's* client trust account to CleanTech rather than Anahuac's account.   Hand testified that after the mistake was recognized, Anahuac's funds held in Hand & Hand's client trust account were debited to reconcile the mistake.

///

- The Court did not find credible Hand's testimony regarding the "mistake."

- There is evidence of the following: (1) $500,000 being sent to from Fangos Consulting to Hand & Hand (ex. 14); (2) $500,000 being deposited into DANAPC's Bank of America account in February 2008 (ex. 15); and (3) $474,900 sent from Duluth's Wells Fargo account to SRS Energy (ex. 17). The Court does not find that this evidence is sufficient to establish that Anahuac paid for its CleanTech debenture. Importantly, no where does Anahuac's name appear on any of the relevant financial transfers, most importantly the transfer to CleanTech or SRS.

27. Anahuac did not receive the Clean Tech shares in 2008 or 2009.

28. The Court cannot determine by a preponderance of the evidence that Mazer ever received the CleanTech stock certificate.

Mazer denied receiving the stock. No documentation of Mazer receiving the stock was presented. Semenov and Hand testified that Mazer received stock certificate and withheld it from Anahuac, but did not testify that they had personal knowledge of Mazer receiving the stock certificate.

Moreover, Semenov's testimony on this point was not credible. First, Semenov testified that he had e-mails–now deleted or lost–between himself and Mazer stating that Anahuac expected Mazer to have possession over the shares and subsequently send them to Anahuac. But when pressed on the point, Semenov stated that Mazer never said he would take possession of the shares, but rather Semenov merely made the assumption that Mazer would deliver the shares to Anahuac. (Dkt. no. 102 at 65-70: "There's a deal, you invest $200,000, you receive shares, and at that point I didn't ask how those shares would be delivered, through Mr. Mazer or directly to Anahuac, because I wasn't getting into those details.")

29. The Court cannot determine by a preponderance of the evidence that Mazer represented to Anahuac that he would deliver CleanTech stock to Anahuac.

Plaintiff presented no documentary evidence that Mazer made such a representation. For reasons explained above, the Court did not find credible Semenov's testimony that Mazer said he would deliver CleanTech stock to Anahuac.

30. The Court cannot find by a preponderance of the evidence that Defendants or Anahuac paid for the CleanTech debenture (*see supra*).

31.   In June of 2010, Anahuac submitted an Affidavit of Lost Certificate to CleanTech, which then issued a replacement certificate for 1,417,300 shares to Anahuac.

32.   Anahuac sold its CleanTech shares in 2010 for the total sum of $40,950.30.

## V.   CONCLUSIONS OF LAW[3]

### A.   Plaintiff Cannot Prove Its Claims by a Preponderance of the Evidence

#### 1.   Fraud in Violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5

"The basic elements of a Rule 10b-5 claim . . . are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

The Court cannot determine by a preponderance of the evidence that Mazer made a material misrepresentation regarding the sale of CleanTech stock here.  One of Anahuac's two central claims in this case is that Mazer made a material misrepresentation to Anahuac by inducing it into purchasing shares of CleanTech stock, which Mazer never intended to deliver.  However, as described *supra*, the Court finds that Mazer never represented to Anahuac that he could help facilitate the sale of CleanTech stock to Anahuac on Anahuac's behalf.  Nor did Mazer ever represent to Anahuac that he would deliver Anahuac the shares of CleanTech stock.  This cause of action fails.

///

///

---

[3]The Court determines that none of the parties' legal claims in this case are proven by a preponderance of the evidence.  Because of this, the Court does not address whether Mazer's affirmative defenses absolve him of liability.  The Court also declines Defendants' invitation to send Anahuac a "loud-and-clear message" that its "falsities will not be tolerated" by sanctioning Anahuac.  (*See* dkt. no. 107 at 20.)

### 2.   NRS §§ 90.310, 90.570, 90.610

NRS § 90.310 makes it unlawful for any person to transact business in Nevada as a broker-dealer or sales representative unless licensed or exempt from doing so under the statute.   But the Court disagrees with Plaintiff that Mazer was engaged in the business of effecting transaction in securities for the account of others.   Plaintiff's claim is premised on the Court determining that Mazer was acting as someone helping Anahuac purchase the debenture on its own behalf.   This was not the case.   The Court finds that Mazer acted on his own behalf, and attempted to purchase CleanTech stock for himself in Anahuac's name.   He did not have a relationship with Anahuac, let alone a broker-dealer relationship.

NRS § 90.570 prohibits one from making fraudulent, deceitful, or untrue statement in connection with the offer to sell, offer to purchase, or purchase of a security.   The Court cannot determine by a preponderance of the evidence that Mazer made any such statement to Anahuac.

NRS § 90.610 makes it unlawful for one to make, or cause to be made, to a purchaser, customer, or client, any untrue representation regarding security licensing, registration, or exemption.   As stated, there is no evidence that Mazer made such a misrepresentation to Anahuac.

### 3.   Fraud

The elements of fraud are "(1) [a] false representation made by the defendant; (2) [d]efendant's knowledge or belief that the representation is false (or insufficient basis for making the representation); (3) [d]efendant's intention to induce the plaintiff to act or to refrain from acting in reliance upon the misrepresentation; (4) [p]laintiff's justifiable reliance upon the misrepresentation; and (5) [d]amage to the plaintiff resulting from such reliance." *Nevada Power Co. v. Monsanto Co.*, 891 F. Supp. 1406, 1413 (D. Nev. 1995) (citations omitted).

///

///

As stated above in Part (V)(A)(1), the Court cannot determine by a preponderance of the evidence that Mazer made a material, false misrepresentation to Anahuac.

### 4. Negligent Misrepresentation

"Nevada follows the definition in Restatement (Second) of Torts § 552 for negligent misrepresentation:"

> One who, in the course of his business, profession or employment, or in any other action in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Scaffidi v. United Nissan*, 425 F. Supp. 2d 1159, 1169 (D. Nev. 2005) (citing *Barmettler v. Reno Air, Inc.*, 114 Nev. 441, 956 P.2d 1382, 1387 (1998)) (other citations omitted). Further, "[a]lthough the word 'fraud' is not found anywhere in the Restatement definition – nor is the intent requirement that normally must accompany an allegation of common law fraud – fraud is still an 'essential element' of a negligent misrepresentation claim." *Id.* (citation omitted). "The difference between fraud and negligent misrepresentation is that a negligent misrepresentation is made without a reasonable basis for believing its truthfulness." *Id.* "In Nevada, the tort of negligent misrepresentation is limited to business transactions." *Id.*

Because the commission of a fraud or a misrepresentation is an essential element of negligent misrepresentation, and the Court cannot determine by a preponderance of the evidence that a fraud occurred here, this claim cannot succeed.

### 5. Breach of Fiduciary Duty

"A breach of fiduciary duty claim requires [p]laintiffs to show the existence of a fiduciary duty, the breach of that duty, and that the breach proximately caused the damages." *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008) (citing *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 880–81 (9th Cir. 2007) (applying Nevada law)) (other citations omitted).

As mentioned, Anahuac's claim that a fiduciary relationship between Mazer and Anahuac existed is predicated on Anahuac's version of the facts – namely, that Mazer introduced Anahuac to CleanTech for the purpose of Anahuac investing in CleanTech stock on its own behalf.  The Court does not find that this occurred.  Rather, Mazer and Hand entered into an agreement whereby Anahuac would purchase stocks in CleanTech on *Mazer's* behalf.  Because of this, the Court cannot find that a fiduciary relationship existed between Mazer and Anahuac.  This claim fails.

### 6.    Conversion

Conversion is "a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights."  *Wantz v. Redfield,* 326 P.2d 413, 414 (Nev. 1958).  Further, conversion is an act of general intent, which does not require wrongful intent and is not excused by care, good faith, or lack of knowledge. *Custom Teleconnect, Inc. v. Int'l Tele-Services, Inc.*, 254 F. Supp. 2d 1173, 1182 (D. Nev. 2003).

The Court does not find by a preponderance of the evidence that the CleanTech stock certificates were ever within Mazer's physical possession.  This claim accordingly fails.

### B.    Defendants Cannot Prove Their Counter-Claims and Claims by a Preponderance of the Evidence

### 1.    Breach of Contract Claim against Jehu Hand

"A plaintiff in a breach of contract action must show (1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1240 (D. Nev. 2008) (citations and quotation marks omitted).

Mazer cannot prove the fourth element, damages, because the Court cannot determine by a preponderance of the evidence that Mazer paid for the CleanTech debenture at issue.  Moreover, while Hand may have breached the contract by not

1   providing Mazer with 95% of the proceeds from the sale of the CleanTech stock, before

2   that point Mazer materially breached the contract by his lack of performance.  "[F]ailure

3   to perform one's obligations within the express terms of an agreement constitutes a

4   literal breach of contract."  *Med. Providers Fin. Corp. II v. New Life Centers, L.L.C.*, 818

5   F. Supp. 2d 1271, 1274 (D. Nev. 2011).  Further, "[a] material breach excuses the non-

6   breaching party from performing under the contract."  *Dialog4 Sys. Eng'g GmbH v.*

7   *Circuit Research Labs, Inc.*, 622 F. Supp. 2d 814, 820 (D. Ariz. 2009).  Without evidence

8   that Mazer in fact provided the funds for the CleanTech debenture, the Court cannot

9   determine that Mazer performed his contractual obligation.  Hand therefore had no duty

10  to provide Mazer with 95% of the proceeds from Anahuac's sale of the CleanTech stock

11  issued in its name.

12                    **2.      Unjust Enrichment against Jehu Hand**

13        "In Nevada, the elements of an unjust enrichment claim or 'quasi contract' are: (1)

14  a benefit conferred on the defendant by the plaintiff; (2) appreciation of the benefit by the

15  defendant; and (3) acceptance and retention of the benefit by the defendant[; and] (4) in

16  circumstances where it would be inequitable to retain the benefit without payment."

17  *WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1196 (D. Nev.

18  2010) (citations omitted).  "Additionally, unjust enrichment occurs whenever a person

19  has and retains a benefit which in equity and good conscience belongs to another."

20  *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182,

21  187 (Nev. 1997) (brackets, quotation marks, and citation omitted).

22        "The doctrine of unjust enrichment or recovery in quasi-contract applies to

23  situations where there is no legal contract but where the person sought to be charged is

24  in possession of money or property which in good conscience and justice he should not

25  retain but should deliver to another [or should pay for]."  *Leasepartners*, 942 P.2d at 187.

26  Defendants recognize this, and made the unjust enrichment argument in the alternative

27  – that is, if the Court finds that no contract existed, it should determine that Defendants

28  unjustly enriched Hand.  (Dkt. no. 92 at 13-14.)  However, the Court determines there

was in fact a contract, but that Mazer did not perform his duties under the contract and therefore accrued no damages.

### 3. Breach of Contract and Unjust Enrichment Claims against Anahuac Management

These claims fail for the same reasons stated above in Part (V)(B)(1)-(2). Because Anahuac was Hand's shell corporation, the contract between Mazer and Hand concerning Anahuac's investment necessarily is a contract with the corporation. As the claims against Hand fail, so too do the claims against Anahuac, and for the same reasons.

## VI.   CONCLUSION

IT IS THEREFORE ORDERED that all claims and counterclaims are dismissed. The Clerk of the Court is HEREBY ORDERED to close the case.

ENTERED THIS 18th day of January 2013.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE